Filed 10/4/19

CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E070042 |
| v. | (Super.Ct.No. RIF1601417) |
| MICHAEL DAMION JUDE MEDRANO, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. Randall Donald White, Judge. (Retired Judge of the Riverside Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) Affirmed.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, Tami Falkenstein Hennick, and Lynn McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts A-C and E of the DISCUSSION.

A jury convicted Michael Damion Jude Medrano of one count of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1), two counts of second degree robbery (§ 211; counts 2 & 4), and one count of assault with force likely to produce great bodily injury (§ 245, subd. (a)(4); count 3). Medrano was 19 years old when he committed the offenses. He was sentenced to 25 years to life, plus seven years.

Medrano was sentenced in December 2017, one and one-half years after the Supreme Court decided *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), which held that when a juvenile offender receives an indeterminate life sentence, the offender must be "given adequate opportunity at sentencing to make a record of mitigating evidence tied to his youth." (*Id.* at p. 269.) The Court remanded the case to the trial court to determine whether the juvenile offender had been given an adequate opportunity to make such a record. (*Id.* at pp. 286-287.)

Medrano asks us to give him the same relief that was granted in *Franklin*. But because Medrano was sentenced one and one-half years after *Franklin*, and because nothing in the record indicates that Medrano lacked an adequate opportunity at sentencing to make a record of mitigating youth-related evidence, we see no basis to order the same relief that the Supreme Court granted in *Franklin*. We note, however, that the Supreme Court has recently held that a juvenile offender whose conviction and sentence are final may file a motion under section 1203.01 for the purpose of making a record of mitigating youth-related evidence. (*In re Cook* (2019) 7 Cal.5th 439, 446-447

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

(*Cook*).) We accordingly affirm without prejudice to Medrano's filing a motion "for a *Franklin* proceeding under the authority of section 1203.01" and *Cook*. (*Id*. at p. 460.)

BACKGROUND

A. *Prosecution's Case*

On the evening of March 21, 2016,[2] three men were physically attacked outside of the Magnolia Tree Apartments (Magnolia Tree) complex in which Medrano lived.[3] Two of the men were robbed, and one was stabbed to death.

Victim One testified that at 7:50 p.m. he was riding his bicycle past the Magnolia Tree complex on his way to a store when three young men ran toward him. Two approached from the front, and one was behind him. The men pushed Victim One off of his bicycle, forcing him to the ground where he landed on his back. More than one of the assailants started punching Victim One in the face. The men also kicked Victim One in the back and hit him in the back of the head with an unidentified object. One of the men said, "Take out the blade," but Victim One never saw a knife. Victim One did not have any idea why the men were hitting him. While Victim One was lying on the ground, he felt hands in his pants pocket. Both his cell phone and his wallet were taken.

Victim One went to the hospital, received stitches for the wound on his head, and spoke with police officers. Several days after the attack, Victim One identified Medrano in a photo lineup as one of the individuals who attacked him. Victim One was not able to

---

[2] All subsequent date references are to 2016 unless otherwise indicated.

[3] We refer to the victims as Victims One, Two, and Three to protect their privacy. (Cal. Rules of Court, rule 8.90(b)(4).)

3

identify Medrano in the courtroom, but Medrano looked different because he had longer hair and was wearing glasses, which he was not wearing in the lineup.

The other surviving victim, Victim Two, testified that he was attacked by three or four men on March 21 while he was across the street from the Magnolia Tree complex in front of an empty field. Victim Two did not know what time it was, but it was dark outside. The men approached Victim Two, who moved to the side to let them pass, but they did not. One of the men punched Victim Two in the face, and Victim Two fell to the ground, where all of the men punched and kicked him in the back, on his face, and on his head. Victim Two lost consciousness. He later awoke in the field and found that his pockets had been emptied of his money and his cell phone. Victim Two could not describe his attackers.

On March 21, Medrano, J.L. (a 16 year old), Eddie Bonilla, and others were hanging out at the apartment of R.R., another resident of the Magnolia Tree complex. According to R.R., who was interviewed by detectives in November 2016, on the night of March 21, Medrano, J.L., and Bonilla were hanging out at his apartment and left the apartment when it started getting dark outside, which was around 7:00 p.m. or 7:30 p.m.[4] When Medrano and J.L. returned to R.R.'s apartment after having gone to the store, R.R. overheard Medrano and J.L. telling Medrano's sister that they had just beaten someone up or "jumped somebody." Bonilla returned five minutes later and said that someone was hit by a car in front of the Magnolia Tree complex. J.L. asked Medrano "Did you–

---

[4]    An audio recording of the interview was played for the jury but not transcribed into the record. The jury was provided a transcript of the interview.

4

stab him?" to which Medrano responded, "Yeah." J.L. seemed mad at Medrano and told Medrano that he "didn't have to do that." R.R. knew that Medrano had acquired a knife one month before March 21.

The Riverside County Sheriff's Department responded to a 911 call that night about a body lying in the street out in front of the Magnolia Tree complex. By the time that law enforcement arrived at the scene, Victim Three was dead. Victim Three was stabbed in the back. There was a bloody shoe print next to the body and additional bloody shoe prints leading up to the front of the apartment complex.

In attempting to locate eyewitnesses, Corporal Joshua Manjarrez and other deputies went door to door in the Magnolia Tree complex. Medrano was in his apartment with his mother, Bonilla, and others. Manjarrez questioned Medrano outside of the apartment, and Medrano asked to leave the complex with his girlfriend. Medrano agreed to sit in the back of a patrol car outside of the complex while Manjarrez relayed the request to his superior. Manjarrez also wanted investigators to analyze Medrano's shoes.

While Medrano was sitting in the back of the patrol car, Detective James Merrill examined Medrano's shoes to determine if they were similar to the shoes that left the bloody footprints around the body. There appeared to be blood on the sides of the shoes but not on the bottom. Merrill collected the shoes as evidence. Blood was also discovered on J.L.'s shoes. The blood on Medrano's and J.L.'s shoes was determined to be that of Victim Two.

Medrano waived his *Miranda* rights and was later interviewed by another detective. Although Medrano changed his story throughout the interview, he eventually admitted that he punched Victim Three after seeing J.L. and Victim Three in a fight. Medrano did not admit to having a knife or stabbing Victim Three.

B. *Defendant's Case—Medrano's Testimony*

Medrano testified on his own behalf. During the afternoon of March 21, Medrano was hanging out at R.R.'s apartment and at some point left the apartment to walk to the store to purchase diapers for Medrano's baby. While walking back from the store, Medrano saw two men fighting in front of the apartment complex. Medrano recognized one of the men as his friend J.L. but did not recognize the other combatant, Victim Three, whom he described as an older man. Victim Three appeared to be winning the fight and to have the "upper hand." Medrano approached the fight and hit Victim Three on the side of his face. Victim Three fell down immediately, and Medrano kicked him multiple times, including in the head. Medrano did not hit Victim Three hard but thought that Victim Three might have fallen so quickly because Victim Three seemed drunk based on the smell of alcohol "around the area." Medrano did not have a knife on him that night, did not own a knife at that time, did not stab Victim Three, and did not see J.L. with a knife. Medrano had been in a recent fight with the mother of his child about "pulling out a knife."

After Victim Three fell, Medrano heard someone say that they were going to call the police. Medrano thought about his daughter and walked away. Medrano looked back

6

and saw Victim Three was standing up, arguing with J.L., and pushing J.L. Medrano went straight to his apartment and did not see J.L. or R.R. at any time after the fight.

Medrano denied robbing Victim One, Victim Two, or anyone else. Medrano admitted to getting into a fight with Victim Two earlier that night. Medrano kicked Victim Two in the face. Medrano did not know why he kicked Victim Two. Victim Two did not initiate the attack. Medrano also got into another fight that day, but it was not with Victim One.

## DISCUSSION

### A. *Failure to Instruct on Voluntary Manslaughter*

Medrano contends that the trial court erred prejudicially by failing to instruct the jury on the lesser included offense of voluntary manslaughter based on a theory of imperfect defense of another. This contention has no merit.

"A trial court must instruct on all lesser included offenses supported by substantial evidence." (*People v. Duff* (2014) 58 Cal.4th 527, 561 (*Duff*).) This obligation arises "whenever there is evidence in the record from which a reasonable jury could conclude the defendant is guilty of the lesser, but not the greater, offense." (*Ibid.*) We independently review whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Simon* (2016) 1 Cal.5th 98, 133 (*Simon*); *People v. Avila* (2009) 46 Cal.4th 680, 705.)

Voluntary manslaughter based on imperfect defense of another is a lesser included offense of murder. (*Duff*, *supra*, 58 Cal.4th at p. 561.) The elements of imperfect

7

defense of another are: (1) The defendant actually believed that someone else was in imminent danger of being killed or suffering great bodily injury; (2) the defendant actually believed that the immediate use of deadly force was necessary to defend against the danger; and (3) at least one of those beliefs was unreasonable. (CALCRIM No. 571.)

Here, Medrano contends that there was sufficient evidence to warrant a voluntary manslaughter instruction on imperfect defense of another based on the "[e]vidence of [Medrano's] belief that [J.L.] was in imminent danger in the fight with [Victim Three]." The evidence that Medrano cites does not support that proposition, because it has no tendency to show that Medrano believed that J.L. was in imminent danger of great bodily injury or death. First, Medrano cites the evidence that he thought Victim Three was drunk as support for the contention that J.L. needed his help. But Medrano did not testify that Victim Three's drunkenness caused Medrano to worry about J.L. at all. On the contrary, Medrano testified that Victim Three's drunkenness so incapacitated Victim Three that he fell immediately when Medrano punched him. Second, Medrano cites the evidence that J.L. later told Medrano that stabbing Victim Three was not necessary. That evidence has no tendency to show that Medrano believed that J.L. was in imminent danger of great bodily injury or death.

Medrano also contends, without citation to the record, that he "believed [J.L.] needed his help." The record contains no evidence that Medrano held that belief. In fact, when asked if J.L. needed help, Medrano testified, "No. He's just a little kid." Moreover, even if the evidence showed that Medrano believed that J.L. needed help in a

8

fight, that would not constitute sufficient evidence to require an imperfect defense of another instruction. That J.L. was on the losing end of a fight does not necessarily mean that he was in imminent danger of death or great bodily injury or that Medrano believed J.L. was in imminent danger.

The only evidence about the fight Medrano allegedly witnessed between J.L. and Victim Three came from Medrano's testimony. Medrano confirmed that when he noticed the fight between J.L. and Victim Three, Medrano thought that Victim Three had the "upper hand." The record contains no evidence that Medrano believed that J.L. was in imminent danger of grave harm because Victim Three—who was unarmed—was winning the fight. There was no evidence about the nature or severity of the fight between J.L. and Victim Three. Medrano did not testify that he punched Victim Three because he actually believed that J.L. was in imminent danger of death or great bodily injury or that he thought he needed to defend J.L. in any way.

There was no evidence that Medrano believed that J.L. was in imminent danger of great bodily harm or death, and speculation does not constitute a sufficient basis ""to require the giving of an instruction on a lesser included offense."" (*People v. Valdez* (2004) 32 Cal.4th 73, 116.) We conclude that the trial court did not err in refusing to instruct on voluntary manslaughter based on a theory of imperfect defense of others.[5]

---

[5] We also reject Medrano's argument that the jury should have been instructed on imperfect defense of another because the jury was instructed on perfect defense of another. Because we conclude that there was not substantial evidence that Medrano believed that J.L. was in imminent danger of great bodily injury or death, the trial court

B. *Prosecutorial Misconduct*

Medrano contends that the prosecutor committed misconduct during closing argument by appealing to the jury's sympathy for the victims. The People contend that the prosecutor did not commit misconduct and that, assuming there was misconduct, Medrano suffered no prejudice. We conclude that if there was error it was not prejudicial.[6]

In general, a prosecutor's appeal to the jury to have sympathy for the victims constitutes misconduct under state law. (*People v. Arias* (1996) 13 Cal.4th 92, 160.) "Reversal of a judgment of conviction based on prosecutorial misconduct [under state law] is called for only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to defendant would have occurred absent the misconduct." (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Medrano complains of the following remarks that the prosecutor made to the jury during closing argument:

---

would not have erred had it refused to instruct on perfect defense either. (*Simon*, *supra*, 1 Cal.5th at p. 134.)

[6] In general, a defendant waives the claim of prosecutorial misconduct in a closing argument by not objecting in the trial court. (*People v. Centeno* (2014) 60 Cal.4th 659, 674; *People v. Dennis* (1998) 17 Cal.4th 468, 521-522.) Medrano acknowledges that his trial counsel did not object to the prosecutor's remarks during closing argument. Medrano asserts, however, that the failure to object amounted to ineffective assistance of counsel. Because of this related ineffective assistance claim, we consider the merits of the misconduct claim. (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

"This man, Mr. Medrano, sought out the most vulnerable individuals of our county. He picked on the weakest, the people that could not fight back for themselves, the people that had problems with reporting, the people he knew wouldn't be able to defend themselves. He picked on the weak.

"And today after I close, after Mr. Carnero closes and after I stand up here again, I will ask that you stand for people that cannot stand for themselves."

Assuming that these comments about the vulnerability of the victims constituted misconduct, we conclude they were harmless.[7] These remarks were isolated and made in the context of a much longer closing argument, and there was strong evidence of Medrano's guilt. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1344 ["Despite this misstep, however, we find the prosecutor's misconduct in making a few remarks in a much longer closing argument, and an even longer trial, could not have prejudiced defendant, especially given the strong evidence of his guilt"].) Here, in a photographic lineup after the attack, Victim One without hesitation identified Medrano as one of the men who attacked him. Medrano testified that he punched and kicked Victim Three and kicked Victim Two. Victim Two's blood was found on Medrano's shoes. R.R. overheard Medrano admit to his sister and J.L. that Medrano stabbed Victim Three.

---

[7] "A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Morales* (2001) 25 Cal.4th 34, 44.) Here, given the limited and isolated nature of the remarks, we conclude that the purported misconduct did not rise to the level of rendering Medrano's trial fundamentally unfair so as to make Medrano's conviction a denial of due process under the federal Constitution. (*Ibid.*) We therefore do not apply the more rigorous federal harmless error standard. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Medrano believes that the evidence against him was weak because there were no eyewitnesses to the murder, Victim Three was not robbed, the stolen items from Victims One and Two were not recovered, and the knife used to stab Victim Three was never found. Those points do not show that the evidence against Medrano was weak. The strength of the evidence of Medrano's guilt is not diminished merely because additional evidence could have been submitted against him. For the reasons already given, the case against Medrano was overwhelming.

In addition, the court instructed the jury that nothing said by the attorneys, during closing argument or otherwise, constituted evidence (CALCRIM No. 222), and that the jurors were not to have their decision influenced by bias, sympathy, or prejudice (CALCRIM No. 101). We presume that jurors "generally understand and follow instructions." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.)

For all of these reasons, we conclude that it is not reasonably probable that the outcome would have been different had the prosecutor not made the statements at issue.

C. *Section 654—Double Punishment*

Medrano contends that his consecutive sentences for the robbery of Victim One (count 2) and the assault of Victim One (count 3) violate section 654. We do not agree.

Section 654 "'prohibits multiple punishment for the same "act or omission."'" (*People v. Correa* (2012) 54 Cal.4th 331, 337.) "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident

12

to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*Id.* at p. 336.) However, a defendant may be punished for each offense, "[i]f he [or she] entertained multiple criminal objectives which were independent of and not merely incidental to each other . . . even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.) Additionally, punishment for each offense is not barred by section 654 if the facts support a finding of similar but consecutively held objectives. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211-1212.)

We will uphold the trial court's express or implied finding that a defendant harbored a separate intent and objective for each offense if the finding is supported by substantial evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 730; *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468.) "We review the trial court's determination in the light most favorable to the [People] and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Medrano contends that the trial court should have stayed the sentence for the assault conviction because the assault of Victim One was incidental to the robbery, so the acts underlying the two convictions constitute an indivisible course of conduct. We agree that there is substantial evidence supporting Medrano's version of the facts. But the trial court implicitly found that Medrano harbored separate and independent intents and

13

objectives when he committed the two crimes, and that implied finding is also supported by substantial evidence.

On this record, the trial court could reasonably find that the attack was motivated by the sole desire to inflict physical harm on Victim One and that the intent to rob Victim One formed separately while the attack was in progress. When Medrano and the other assailants ran up to Victim One, they did not say anything. No demands were made by Medrano or the other assailants to have Victim One turn over his belongings before the attack began. Without any warning, threat, or demand, Medrano and the others punched Victim One in the face and punched and kicked him once he hit the ground.

Moreover, Medrano testified that he did not rob Victim One or anyone else. Although he did not admit to assaulting Victim One, he did admit to kicking Victim Two in the face that night while also denying robbing Victim Two. Medrano also denied ever robbing anyone because he considered robbery "terrible." Medrano's steadfast denial of ever robbing anyone while readily admitting to assaulting multiple people supports the trial court's implied finding that the robbery and assault of Victim One involved a divisible course of conduct.

Medrano asserts that "[b]ecause [Victim One] was on a bike and did not voluntarily dismount his bike and volunteer his belongings which were on his person, the assailants had to knock him down on the ground to take his belongings." That is, Medrano argues that he had to assault Victim One in order to rob him because Victim One did not hand Medrano his phone and wallet immediately upon seeing Medrano and

14

the other assailants. This argument fails because it assumes the point at issue, namely, that Medrano intended all along to rob Victim One. The trial court implicitly found, to the contrary, that Medrano initially intended only to assault Victim One, and that finding is supported by substantial evidence.

Because there was substantial evidence supporting the trial court's implied finding that the course of conduct comprising the two crimes was divisible, we affirm the trial court's determination that there was no basis under section 654 to stay the one-year consecutive sentence on count 3 (the assault of Victim One).

D. *Franklin Proceeding*

Medrano was 19 years old when he committed the offenses. He received an indeterminate sentence of 25 years to life, so he will be entitled to a youth offender parole hearing during his 25th year of incarceration. (§ 3051, subd. (b)(3).) "A youth offender parole hearing is a hearing by the Board of Parole Hearings [the Board] for the purpose of reviewing the parole suitability of any prisoner who was 25 years of age or younger . . . at the time of his or her controlling offense." (§ 3051, subd. (a)(1).) At the youth offender parole hearing, the Board "shall give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner in accordance with relevant case law." (§ 4801, subd. (c).)

In *Franklin*, *supra*, 63 Cal.4th 261, the Supreme Court held that when a juvenile offender receives an indeterminate life sentence, the offender must be "given adequate

opportunity at sentencing to make a record of mitigating evidence tied to his youth." (*Id.* at p. 269.) The case was remanded to the trial court "for the limited purpose of determining whether [the offender] was afforded an adequate opportunity to make a record of information" relevant to his eventual youth offender parole hearing. (*Id.* at pp. 286-287.)

Medrano argues that he is entitled to the same relief that the Supreme Court granted in *Franklin*. He notes that "defense counsel did not present evidence on [Medrano's] level of maturity, cognitive ability, [or] other youth[-]related factors or mitigating factors." He argues that "[b]ecause the record is undeveloped on the issue and it is unclear whether defense counsel understood the need and opportunity to develop the record type contemplated by the Court in [*Franklin*], the case should be remanded so the trial court can follow the procedures set forth in *Franklin* to ensure that such opportunity is afforded to appellant." The People agree, but we do not.

The record contains no indication that Medrano was not given an adequate opportunity to make a record of mitigating youth-related evidence as contemplated in *Franklin*. Section 3051 was amended effective January 1, 2016, to require youth offender parole hearings for offenders who were 25 years old or younger at the time of the controlling offense. (Stats. 2015, ch. 471, § 1.) The Supreme Court decided *Franklin* in May 2016. Medrano was sentenced in December 2017 for offenses he committed when he was 19 years old. Thus, the Supreme Court decision establishing Medrano's right to present mitigating youth-related evidence at sentencing was in place for one and

16

one-half years before Medrano was sentenced. The record does not indicate that Medrano's opportunity to exercise that right was inadequate in any respect. Rather, it appears that he merely failed—whether by choice or by inadvertence—to exercise it.

Medrano cites *People v. Jones* (2017) 7 Cal.App.5th 787 (*Jones*) for the proposition that a *Franklin* remand is appropriate if "it is unclear whether [the offender] understood both the need and the opportunity to develop the type of record contemplated by *Franklin*." (*Id*. at p. 820.) But in *Jones*, the offender had been sentenced before *Franklin* was decided, and that fact was central to the court's analysis. (*Id*. at p. 819.) Because Medrano was sentenced one and one-half years after *Franklin* was decided, *Jones* is inapplicable.

In addition, the Supreme Court recently held that a petition for writ of habeas corpus is an inappropriate procedural vehicle for obtaining a *Franklin* proceeding, at least in the first instance, because a juvenile offender whose conviction and sentence are final may file a motion under section 1203.01 (and the trial court's powers under Code of Civil Procedure section 187) for the purpose of making a record of mitigating youth-related evidence.[8] (*Cook*, *supra*, 7 Cal.5th at pp. 446-447.) *Cook* is of course distinguishable because it is a habeas corpus case, and Medrano's case is before us on direct appeal. But

---

[8] Briefing in this case was already complete when the Supreme Court decided *Cook*, so we asked the parties to file supplemental briefs addressing *Cook*'s impact, if any, on this appeal. Neither party's position changed in light of *Cook*—in their briefs, the parties continued to agree that Medrano should receive the same relief that was granted in *Franklin*. At oral argument, however, the Attorney General agreed with our conclusion that Medrano was not deprived of an adequate opportunity to make a record of mitigating youth-related evidence at sentencing.

given the availability of the motion hearing described in *Cook*, we see no basis to order the same relief that was granted in *Franklin*. Instead, we affirm without prejudice to Medrano's filing a motion "for a *Franklin* proceeding under the authority of section 1203.01" and *Cook*. (*Id.* at p. 460.)[9]

E. *Actual Custody Credit*

A criminal defendant is entitled to actual custody credit for "all days of custody" spent in jail before sentencing (§ 2900.5, subd. (a)), "including partial days" (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48). "Calculation of custody credit begins on the day of arrest and continues through the day of sentencing." (*Ibid.*; *People v. Bravo* (1990) 219 Cal.App.3d 729, 735.) Medrano was awarded 646 days of actual custody credit. As the parties correctly agree, Medrano was entitled to actual custody credit for 648 days, which accounts for the total period of incarceration from the date of his arrest

---

[9]     *People v. Carranza* (Sept. 30, 2019, A152211) ___ Cal.App.5th ___ [2019 WL 4745461], which was filed the day before oral argument in the instant case, held that the right to a *Franklin* proceeding can be waived either orally or in writing but cannot be forfeited by inaction. We do not find the reasoning in *Carranza* persuasive, and we decline to follow it. In our view, *Carranza* fails to articulate a sound basis for declining to apply to the right to a *Franklin* proceeding the same forfeiture rules that apply to countless other rights in criminal proceedings. In addition, *Carranza* reasons that because (1) claims of ineffective assistance of counsel "typically fail" on direct appeal, and (2) under *Cook* a petition for writ of habeas corpus is not an appropriate vehicle for seeking a *Franklin* proceeding either, it follows that (3) the right to a *Franklin* proceeding should not be subject to forfeiture by inaction, because such inaction might be the result of ineffective assistance for which there appears to be no remedy. (*Carranza*, *supra*, at p. *7.) We disagree. *Cook* held that a habeas petition is not an appropriate vehicle for seeking a *Franklin* proceeding because there *is* an adequate remedy at law, namely, a motion under section 1203.01. (*Cook*, *supra*, 7 Cal.5th at p. 447.)

18

on March 22, 2016, through the time of his sentencing on December 29, 2017.  The abstract of judgment should be corrected to reflect 648 days of actual custody credit.

## DISPOSITION

The judgment is affirmed without prejudice to Medrano's filing a motion "for a *Franklin* proceeding under the authority of section 1203.01" and *Cook*.  (*Cook*, *supra*, 7 Cal.5th at p. 460.)  The trial court is directed to:  (1) prepare an amended abstract of judgment, indicating 648 days of actual custody credit, and (2) forward a certified copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

CERTIFIED FOR PARTIAL PUBLICATION

MENETREZ
                                                                                          J.


We concur:

SLOUGH
                   Acting, P. J.
RAPHAEL
                                    J.